■ In the Matter of HARRY JOSIFIDIS, Petitioner, v RICHARD F. DAINES, as Commissioner of Health, et al., Respondents. [932 NYS2d 258]—

Garry, J.

Petitioner, a physician licensed to practice medicine in New York, was excluded by certain health insurers from being reimbursed as an in-network provider for treatment rendered to their insureds as the result of a prior disciplinary action. He thereafter entered into an agreement with another physician (hereinafter the other physician) by which the other physician's name appeared on claims submitted to the insurers for petitioner's treatment of in-network patients. In February 2010, the Bureau of Professional Medical Conduct charged petitioner with 15 specifications of professional misconduct in violation of various provisions of Education Law § 6530. Petitioner and the other physician testified at a hearing conducted before a Hearing Committee of respondent State Board for Professional Medical Conduct and an Administrative Law Judge. The Committee entered a determination and order sustaining two of the specifications of professional misconduct, revoked petitioner's license to practice medicine, and imposed a fine (*see* Public Health Law § 230-a [4], [7]). Petitioner commenced this CPLR article 78 proceeding in this Court pursuant to Public Health Law § 230-c (5), seeking annulment of the determination and order, and this Court stayed its execution during the pendency of the proceeding.

Petitioner contends that the Committee incorrectly determined that he committed the fraudulent practice of medicine

(*see* Education Law § 6530 [2]).[1] A determination of fraudulent practice must be supported by " 'proof of either an intentional misrepresentation or concealment of a known fact, [and] the intent or knowledge element may be inferred from the surrounding circumstances' " (*Matter of Ross v State Bd. for Professional Med. Conduct*, 45 AD3d 927, 929 [2007], *lv denied* 10 NY3d 701 [2008], quoting *Matter of Steckmeyer v State Bd. for Professional Med. Conduct*, 295 AD2d 815, 817-818 [2002]). The Committee determined that petitioner "knowingly and with intent to mislead insurance companies caused bills . . . to be submitted . . . falsely under another physician's name as the provider when the services were rendered by [petitioner] who was ineligible to bill those insurance companies." Our review is limited to determining whether the decision was supported by substantial evidence (*see Matter of Patin v State Bd. for Professional Med. Conduct*, 77 AD3d 1211, 1212 [2010]; *Matter of D'Angelo v State Bd. for Professional Med. Conduct*, 66 AD3d 1154, 1155 [2009]), and we find that it was.

The other physician testified that as a temporary condition of petitioner's return to practice after the previous disciplinary determination, he had provided "in-house supervision" to petitioner for certain procedures. When the supervisory period ended in approximately 2002, petitioner asked the other physician to continue to work with him as the provider of record for patients in the insurance networks from which petitioner had been excluded, so that petitioner could continue to treat them. The other physician agreed, and drafted an agreement under which he would "take over the global management of those patients in [petitioner's] practice (current and future) who had fallen out of [petitioner's] providership ability and who wish to continue their care in this practice." The agreement provided, among other things, that petitioner would immediately introduce the other physician to the affected patients as the provider of record, that each patient would receive and sign an "introductory letter" describing the arrangement, that petitioner would treat these patients "only under [the other physician's] providership and under [his] hire," and that all services he provided to them were to be cleared by the other physician. The other physician was to compensate petitioner by paying him approximately half of the amounts collected from insurers.

In furtherance of the agreement, the other physician testified that he traveled to petitioner's office approximately two days a week to meet with petitioner's in-network patients and provide

---

1. Petitioner does not contest the Hearing Committee's conclusion that he failed to maintain records for one patient.

certain services. Petitioner's employees prepared bills under the other physician's name for his services, as well as for services that petitioner provided to the in-network patients. After the other physician reviewed the bills and requested any necessary adjustments, petitioner's employees submitted them to the insurers. The insurers paid the other physician, who provided petitioner with his share of the payments, ranging between $70,000 and $100,000 during each of the five years the agreement was in place.

The other physician testified that the arrangement functioned fairly smoothly for the first year, but thereafter, the number of patients that the other physician was overseeing began to grow "beyond control" so that he did not meet or have contact with all of them. Additionally, he testified that from the beginning of the arrangement, petitioner frequently failed to advise the patients of his affiliation with the other physician, that it took two years before petitioner drafted a satisfactory introductory letter for the patients, and that even after the letter was drafted, he frequently failed to provide it to patients or document that he had done so by placing a signed copy in their charts. The other physician stated that, as a result, a growing population of patients had no knowledge of his existence, but were billed for services in his name. In the other physician's estimation, he saw only approximately 40% of the patients who were billed in his name during the life of the agreement. In evaluating the credibility of this account, the Committee found that the other physician was "not fully persuasive" because of his complicity in the arrangement, but nonetheless concluded that his testimony, when combined with other evidence in the record, was sufficiently credible to establish that petitioner made intentional misrepresentations to insurers in order to obtain reimbursement. We find no basis in the record to disturb this credibility assessment, which was within the Committee's "exclusive province" (*Matter of Chamberlin v New York State Bd. for Professional Med. Conduct*, 34 AD3d 1097, 1098 [2006] [internal quotation marks and citations omitted]; *accord Matter of Patin v State Bd. for Professional Med. Conduct*, 77 AD3d at 1212).

Petitioner asserts that he did not have the requisite intent to support a charge of fraudulent practice; during his testimony, he contended, among other things, that he did not believe his arrangement with the other physician was improper. However, the Committee rejected the explanations he offered for his conduct, finding that he was "consistently evasive," that he distorted the truth, and that his testimony, taken as a whole,

was "patently not credible." As before, we find no reason to disturb this assessment. Petitioner testified that he relied on the other physician's representation that their agreement was "lawful and appropriate," but the Committee made a specific finding that this position was "not credible," noting that petitioner, rather than the other physician, had originated the idea for the arrangement. Petitioner further contended that the other physician told him that he had advised the insurers of the arrangement and had obtained their approval, but the other physician denied that this had occurred, and no other evidence in the record supports this claim. Further, even if petitioner believed that the agreement drafted by the other physician was legitimate or that it had been accepted by the insurers, the testimony reveals that he consistently failed to comply with it.

An inference of intent to deceive is a factual determination to be made by the Committee (*see Matter of Corines v State Bd. for Professional Med. Conduct*, 267 AD2d 796, 800 [1999], *lv denied* 95 NY2d 756 [2000]), and such an inference may properly be drawn when the Committee finds that explanations for fraudulent misrepresentations are incredible (*see Matter of Catsoulis v New York State Dept. of Health*, 2 AD3d 920, 921 [2003]). Substantial evidence in the record shows that petitioner repeatedly submitted bills in the other physician's name for services he had provided in order to receive payment from insurers who had specifically excluded him from being reimbursed for such services, and thus fully supports the Committee's conclusion that he made intentional misrepresentations in order to obtain reimbursement (*see Matter of Tsirelman v Daines*, 61 AD3d 1128, 1130 [2009], *lv denied* 13 NY3d 709 [2009]; *Matter of Ostad v New York State Dept. of Health*, 40 AD3d 1251, 1253 [2007]).

Petitioner further contends that he entered into the agreement to provide his patients with continuity of care rather than for profit, arguing that the reimbursements he received were barely sufficient to cover his overhead and expenses. However, fraudulent practice need not benefit a physician or injure a patient to constitute misconduct (*see Matter of Youssef v State Bd. for Professional Med. Conduct*, 6 AD3d 824, 826 [2004]). Notably, the agreement explicitly applied not only to those patients that petitioner was already treating before he was excluded by the insurers, but also to future patients, and the other physician testified that the number of patients increased during the life of the agreement. Finally, we reject petitioner's claim that he did not cause false bills to be submitted because the other physician reviewed and approved them before they

were submitted in his name; the testimony established that petitioner's employees prepared and submitted the bills, at petitioner's direction and with his knowledge. Accordingly, we find that the Committee properly rejected petitioner's explanations and substantial evidence in the record supports its determination (*see Matter of Tsirelman v Daines*, 61 AD3d at 1129; *Matter of Corines v State Bd. for Professional Med. Conduct*, 267 AD2d at 799-800).[2]

Turning to petitioner's contention that the penalty imposed is excessive, this will not be disturbed unless it is " 'so incommensurate with the offense as to shock one's sense of fairness' " (*Matter of Zahl v Daines*, 63 AD3d 1314, 1316 [2009], quoting *Matter of Bursztyn v Novello*, 42 AD3d 596, 598 [2007]). Even when no patient is harmed and the physician does not gain financially, revocation may be an appropriate penalty for insurance fraud, which violates the public trust (*see Matter of Zharov v New York State Dept. of Health*, 4 AD3d 580, 580 [2004]). Here, the Committee noted petitioner's prior disciplinary history of "repeated egregious conduct warrant[ing] a severe sanction," observed that in both disciplinary proceedings, petitioner attempted to shift blame onto another physician rather than accepting responsibility for his own conduct, and found that nothing short of revocation would protect the public from the risk of recurrence. Given petitioner's history, lack of contrition, and efforts to evade the consequences of his prior discipline, we do not find the penalty shockingly disproportionate (*see Matter of Tsirelman v Daines*, 61 AD3d at 1131; *Matter of Ostad v New York State Dept. of Health*, 40 AD3d at 1253; *Matter of Zharov v New York State Dept. of Health*, 40 AD3d at 581).

Spain, J.P., Rose, Lahtinen and Egan Jr., JJ., concur. Adjudged that the determination is confirmed, without costs, and petition dismissed.

---

2. As petitioner notes, the Committee's determination and order contains certain inconsistencies and factual misstatements. For example, the Committee misstated petitioner's area of specialty, and it sustained the specification of failure to maintain records for only one patient after finding that he had failed to so for four patients. However, these relatively minor errors had no effect on the Committee's conclusions as to petitioner's primary act of misconduct—that is, circumventing his exclusion from insurers' networks by using another physician's name—and thus, no modification of the findings or penalty is warranted (*see Matter of Peress v Administrative Review Bd. for Professional Med. Conduct*, 294 AD2d 753, 754-755 [2002]).