Matter of Roberts v New York State Bd. for Professional Med. Conduct (2023 NY Slip Op 01928)

Matter of Roberts v New York State Bd. for Professional Med. Conduct

2023 NY Slip Op 01928

Decided on April 13, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 13, 2023

534554
[*1]In the Matter of Danielle Roberts, Petitioner,
v
New York State Board for Professional Medical Conduct, Respondent.

Calendar Date:February 16, 2023

Before:Egan Jr., J.P., Clark, Pritzker, Ceresia and Fisher, JJ.

Law Office of Anthony Z. Scher, Rye Brook (Anthony Z. Scher of counsel), for petitioner.
Letitia James, Attorney General, New York City (James M. Hershler of counsel), for respondent.

Fisher, J.
Proceeding pursuant to CPLR article 78 (initiated in this Court pursuant to Public Health Law § 230-c [5]) to review a determination of a Hearing Committee of respondent revoking petitioner's license to practice medicine in New York.
Petitioner, a physician board-certified in family practice, was licensed to practice medicine in New York in 2009. She subsequently became involved in a personal development organization known as NXIVM and was invited to join a secret society operating under the umbrella of NXIVM known as Dominus Obsequious Soroium (hereinafter DOS). Membership in DOS involved a lifetime commitment to a "master/slave relationship" between a "mentor" and a new member, wherein an enrollee would give a "vow of obedience" — backed by damaging collateral [FN1] — and undergo an initiation ceremony that involved receiving a specific branding in the pelvic region that included the NVIXM founder's initials. Over the course of petitioner's involvement with DOS, she performed the video-recorded ceremonial branding of 17 women with an electrocautery device, most of whom were nude and had to be held down by other members or enrollees.
In 2020, following the investigation into a complaint filed by a former DOS member (hereinafter the complainant) who had been branded by petitioner, the Bureau of Professional Medical Conduct charged petitioner with committing 47 specifications of professional misconduct. The charges related primarily to petitioner's actions of branding women during the DOS initiation ceremonies, but certain charges were also related to petitioner's attendance at a NXIVM corporate retreat and her failure to report the outbreak of an illness thereat. Petitioner narrowly challenged the charges on the ground that respondent did not have jurisdiction to bring such charges against her because she was not engaged in the practice of medicine while performing the branding and that her duty to report an outbreak did not extend to her attendance at a corporate retreat. Following an extensive hearing, a Hearing Committee of respondent (hereinafter the Committee) found that petitioner was engaged in the practice of medicine, sustained all 47 charges and revoked petitioner's license to practice medicine. Petitioner then commenced this CPLR article 78 proceeding seeking to annul the Committee's determination.
Petitioner did not seek review by respondent's Administrative Review Board; therefore, our scope of review is limited to whether the Committee's decision is supported by substantial evidence (see Matter of Josifidis v Daines, 89 AD3d 1257, 1258 [3d Dept 2011], lv denied 19 NY3d 801 [2012]; compare Matter of D'Souza v New York State Dept. of Health, 68 AD3d 1562, 1563 [3d Dept 2009]). "Substantial evidence is a minimal standard that requires less than the preponderance of the evidence and demands only the existence of a rational basis in the record as a whole to support the findings upon which the determination is based" (Matter of Vera-Llivicura [*2]v State of New York, 211 AD3d 1447, 1449 [3d Dept 2022] [internal quotation marks and citations omitted]). To that extent, "[w]hether the alleged misconduct actually occurred within the practice of medicine is a factual determination to be made by the Committee which will not be disturbed if it has a rational basis" (Matter of Addei v State Bd. for Professional Med. Conduct, 278 AD2d 551, 552 [3d Dept 2000]). During our review, "we will defer to the Committee's credibility determinations and resolution of conflicting evidence" (Matter of Anghel v Daines, 86 AD3d 869, 872 [3d Dept 2011]).
As relevant here, "[t]he practice of the profession of medicine is defined as diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition" (Education Law § 6521). The definition of "physical" encompasses "[o]f, relating to, or involving someone's body as opposed to mind" (Black's Law Dictionary [11th ed 2019], physical). Unlike tattooing and body art, branding is not regulated in New York, but courts have nonetheless considered electric cauterization to come under the purview of a medical procedure (see Bing v Thunig, 2 NY2d 656, 659-663 [1957]; Sutch v Yarinsky, 292 AD2d 715, 716-717 [3d Dept 2002]; Lohan v Evanczyk, 229 AD2d 844, 844-845 [3d Dept 1996]).
Here, we find that substantial evidence supports the Committee's determination to sustain the specifications of professional misconduct related to the ritual branding of members of DOS. The record established that petitioner acknowledged that she relied on her medical background for "life" and that she could not "separate [herself] from [her] medical experience" or from her "education as a physician." Her status as a physician was well-known within the NXIVM community. Resultantly, she was approached by higher-ranking DOS members to perform the ceremonial brandings and, although several non-physician members were considered to perform the branding, petitioner was ultimately chosen. Several of the DOS members who were branded, including the complainant, provided testimony to the effect that they were relieved or comforted knowing that a physician would be performing the branding.
In carrying out the ceremonial branding, petitioner's act of using an electric cauterization tool altered the members' skin, appearance and physical condition of their pelvic region. Although petitioner contends that her ritualistic branding of DOS members was for nonmedical reasons and lacked a sufficient nexus with the practice of medicine, it is apparent that petitioner used her medical knowledge and training to create a specific physical condition — a permanent scar — on the enrollees. In doing so, the Bureau's expert testified that petitioner's actions in branding DOS members constituted the practice of medicine by "operating" on a physical condition (see Education Law § 6521; Black's Law Dictionary [11th ed 2019], physical). Although the Committee also heard conflicting [*3]testimony from petitioner's expert, who testified that branding does not constitute the practice of medicine because it is more like a "scrape" and not a burn, this is belied by the record; images of the complainant's branding depicted second-degree burns. As such, the Committee's credibility determinations regarding the experts, and the reliance it placed on such testimony, are supported by substantial evidence in the record (see Matter of Anghel v Daines, 86 AD3d at 872; see also Matter of Eisenberg v Daines, 99 AD3d 1117, 1119 [3d Dept 2012]).
Furthermore, several witnesses testified that, following the branding ritual, petitioner also provided wound care, which consisted of her applying ointment and a bandage to the injury site. Newly-branded members were then instructed to send photographs of their branding to a liaison, who then forwarded the photographs to petitioner for her review and further healing instructions. According to the complainant, petitioner was the only physician that they were allowed to consult with regarding their branding, as members were prohibited from seeking a second opinion and were instructed to only contact the liaison or petitioner with issues related to the healing process.[FN2] To that end, the record demonstrates that the complainant had direct contact with petitioner as it related to her branding wound and the prolonged healing process caused by her second-degree burn. Based on the foregoing, we find no reason to disturb the Committee's finding that petitioner was engaged in the practice of medicine during the ritualistic branding ceremonies (see Matter of Addei v State Bd. for Professional Med. Conduct, 278 AD2d at 552).
Similarly, we also find that substantial evidence supports the Committee's determination to sustain the specifications of professional misconduct related to petitioner's failure to report the outbreak at a week-long NXIVM corporate retreat. Petitioner did not refute the Bureau's infectious disease expert, who testified that a physician has a duty to report "[a]ny disease outbreak or unusual disease" to public health officials, even while on vacation (10 NYCRR 2.1 [c]). Although petitioner testified that she attended the retreat as part of her personal life, petitioner nevertheless and inconsistently testified that the retreat was a "working vacation" for her. The record reflects that she taught free workouts each morning, which one witness described as "very much leaning on her credentials as a doctor" during the class and in the instructional material. The witness further testified that petitioner's credentials were mentioned in several different contexts throughout the week, and that members would turn to her with questions. Other witnesses testified as to the extent and symptoms of the outbreak, which mirrored norovirus and spread rapidly to attendees — including vulnerable members who were pregnant or cancer patients. Based on these statements and other evidence, the Bureau's expert testified [*4]that there was "no question" that the illness constituted an infectious disease outbreak, triggering petitioner's duty to report the incident. Accordingly, we are unpersuaded by petitioner's contentions that the record lacked substantial evidence to support the Committee's determination that she had a duty to report the outbreak (see Matter of Josifidis v Daines, 89 AD3d at 1260-1261; Matter of Youssef v State Bd. for Professional Med. Conduct, 6 AD3d 824, 825-826 [3d Dept 2004]).
Lastly, we reject petitioner's challenge related to the evidentiary rulings by the Administrative Law Judge at the hearing. In an administrative proceeding, "the rules of evidence are not strictly applied" (Matter of Anghel v Daines, 86 AD3d at 869; see Public Health Law § 230 [10] [f]), but rather"[c]onsiderable leeway regarding the rules of evidence is permitted . . . and the requirements of due process are not as exacting in such proceedings as in criminal cases" (Matter of Rigle v Daines, 78 AD3d 1249, 1250 [3d Dept 2010], appeal dismissed 16 NY3d 825 [2011]; see Matter of Eisenberg v Daines, 99 AD3d at 1118). In order to warrant annulment of the Committee's determination, "an erroneous evidentiary ruling must infect the entire proceeding with unfairness" (Matter of Rigle v Daines, 78 AD3d at 1251 [internal quotation marks and citations omitted]). Based upon our review of the record, petitioner has failed to make such a showing. We have examined petitioner's remaining arguments and have found them to be without merit or academic.
Egan Jr., J.P., Clark, Pritzker and Ceresia, JJ., concur.
ADJUDGED that the determination is confirmed, without costs, and petition dismissed.

Footnotes

Footnote 1: According to the testimony from several witnesses, damaging collateral was used as coercive leverage to motivate and ensure compliance with the "vow of obedience." Such materials often consisted of an enrollee providing nude photographs; letters admitting to sexual deviance, affairs and drug use; or providing the title to a home, vehicle or bank account to higher-ranking members of DOS.

Footnote 2: Although this allegation is contested by the other witnesses who were also branded, it cannot be ignored from the record that the inherent nature of this secret society guided their testimony. Notably, the witnesses who provided conflicting testimony had also acknowledged that they had given damaging collateral, were aware of the "consequences" of breaking their vow of obedience and some witnesses admitted they were aware that the complainant, after reporting the incident and therefore breaking her vow, experienced universal condemnation from the NXIVM community and had her damaging collateral released to journalists. Accordingly, substantial evidence in the record supports the Committee's credibility determinations arrived at by weighing the conflicting statements from the complainant and the witnesses (see Matter of Eisenberg v Daines, 99 AD3d at 1119; Matter of Anghel v Daines, 86 AD3d at 872).