Matter of Yi v New York State Bd. for Professional Med. Conduct (2024 NY Slip Op 01955)

Matter of Yi v New York State Bd. for Professional Med. Conduct

2024 NY Slip Op 01955

Decided on April 11, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 11, 2024

535191
[*1]In the Matter of Won Yi, Petitioner,
v
New York State Board for Professional Medical Conduct, Respondent.

Calendar Date:January 10, 2024

Before:Clark, J.P., Lynch, Reynolds Fitzgerald, McShan and Powers, JJ.

Law Office of Anthony Z. Scher, Rye Brook (Anthony Z. Scher of counsel), for petitioner.
Letitia James, Attorney General, New York City (Jessica Preis of counsel), for respondent.

Lynch, J.
Proceeding pursuant to CPLR article 78 (initiated in this Court pursuant to Public Health Law § 230-c [5]) to review a determination of a Hearing Committee of respondent revoking petitioner's license to practice medicine in New York.
Petitioner received a license to practice medicine in New York in 2006 and became board certified in the field of radiation oncology. He served most of his medical career as the director of a private radiation oncology practice in Erie County. In 2018, the Bureau of Professional Medical Conduct charged petitioner with 17 specifications of practicing medicine with gross negligence, gross incompetence, negligence on more than one occasion, incompetence on more than one occasion and failure to maintain accurate records, all relating to his care of seven patients between 2009 and 2013. Petitioner answered the charges and denied the specifications. Following an extensive hearing, respondent's Hearing Committee sustained all but the record-keeping charge against petitioner and revoked his license. Petitioner commenced this CPLR article 78 proceeding in this Court challenging the Committee's determination. For the reasons that follow, we confirm.
Our review in this proceeding is limited to determining whether the Hearing Committee's determination is supported by substantial evidence (see Matter of Roberts v New York State Bd. for Professional Med. Conduct, 215 AD3d 1093, 1094 [3d Dept 2023], lv denied 40 NY3d 907 [2023]) — a "minimal standard" that requires "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact" (Matter of Haug v State University of New York at Potsdam, 32 NY3d 1044, 1046 [2018] [internal quotation marks and citations omitted]). "So long as the evidence meets that standard, we will defer to the credibility determinations made by the Committee" (Matter of Tsirelman v Daines, 61 AD3d 1128, 1129 [3d Dept 2009] [citations omitted], lv denied 13 NY3d 709 [2009]).
As a threshold matter, petitioner argues that respondent's expert — Isamettin Aral — did not provide competent expert opinion evidence necessary to sustain the charges, claiming that he improperly relied solely on practice guidelines published by professional medical societies to support his opinion that petitioner deviated from the standard of care in his treatment of each of the seven patients at issue. We disagree. In a medical disciplinary proceeding, a finding of negligence is warranted where "a physician failed to exercise the care that a reasonably prudent physician would exercise under the circumstances" (Matter of Bogdan v New York State Bd. for Professional Med. Conduct, 195 AD2d 86, 88 [3d Dept 1993], appeal dismissed & lv denied 83 NY2d 901 [1994]; cf. PJI 2:150). Incompetence, which constitutes a separate act of misconduct under the Education Law (compare Education Law § 6530 [3], [4], with Education Law § 6530 [5], [6]), speaks to the lack of the requisite skill or knowledge to practice [*2]medicine, rising to the level of gross incompetence when the deficiency is significant and implicates potentially grave consequences (see Matter of Post v State of N.Y. Dept. of Health, 245 AD2d 985, 986 [3d Dept 1997], lv denied 10 NY3d 701 [2008]; Matter of Dhabuwala v State Bd. for Professional Med. Conduct, 225 AD2d 209, 213 [3d Dept 1996]). Expert medical opinion evidence is required to establish that there was a deviation from accepted practice that caused injury to the patient (see Mazella v Beals, 27 NY3d 694, 705 [2016]). "Generally, the standard of care for a physician is one established by the profession itself" (Spensieri v Lasky, 94 NY2d 231, 238 [1999]; see Toth v Community Hosp., 22 NY2d 255, 262 [1968]). As a general premise, clinical practice guidelines do not define a standard of care as to medical negligence, but are utilized to inform a physician's decision-making process (see Hinlicky v Dreyfuss, 6 NY3d 636, 645-646 n 4, 5 [2006]; Diaz v New York Downtown Hosp., 99 NY2d 542, 545 [2002]).
In his 2018 testimony, Aral referred to guidelines published by Bahman Emani, the National Comprehensive Cancer Network (hereinafter NCCN) and the American College of Radiology (hereinafter ACR) as defining the "standard of care." In particular, he referred to the Emani standards — published 25 or 30 years ago — as being "considered gospel for decades," and explained that the NCCN and ACR guidelines "are fairly descriptive, prescriptive guidelines for what a physician should do in the management of cases in very specific areas," averring that "[w]hen [a doctor] deviate[s] from those, it is considered to fall short of the standard" of care. He also cited the Quantitative Analysis of Normal Tissue Effects in the Clinic (hereinafter QUANTEC) data from 10 years ago as a standard of care in the field of radiation oncology. For his part, petitioner's expert, Michael Kos, testified that he also considered the Emani guidelines and the QUANTEC analysis in making decisions as to radiation doses.
None of the referenced guidelines are in the record. Even so, we can take judicial notice of the practice guidelines included on the websites of both the NCCN and the ACR. The ACR preamble describes the guidelines as "an educational tool," explaining that "[p]ractice [p]arameters and [t]echnical [s]tandards are not inflexible rules or requirements of practice and are not intended, nor should they be used, to establish a legal standard of care" (ACR-ARS Practice Parameter for Radiation Oncology, Preamble, available at https://www.acr.org/Clinical-Resources/Practice-Parameters-and-Technical-Standards [last accessed Mar. 20, 2024]; see Iowa Med. Soc'y v Iowa Bd. of Nursing, 831 NW2d 826, 836 [Iowa S Ct 2013]; Stanley v McCarver, 204 Ariz 339, 344 n 4, 63 P3d 1076, 1081 n 4 [Ariz Ct App 2003], mod 208 Ariz 219, 92 P3d 849 [2004]). The NCCN guidelines are described as "the recognized standard for clinical direction and policy in cancer care and are the most thorough [*3]and frequently updated clinical practice guidelines available in any area of medicine" (National Comprehensive Cancer Network, https://www.nccn.org/guidelines/guidelines-process/about-nccn-clinical-practice-guidelines [last accessed Mar. 20, 2024]). The guidelines "provide recommendations based on the best evidence available at the time they are derived. Because new data are published continuously, it is essential that the NCCN Guidelines also be continuously updated and revised to reflect new data and clinical information that may add to or alter current practice standards" (National Comprehensive Cancer Network, https://
www.nccn.org/guidelines/guidelines-process/about-nccn-clinical-practice-guidelines [last accessed Mar. 20, 2024]).
By the qualifying language set forth in each document, the ACR and NCCN guidelines provide contemporary informed treatment recommendations that are flexible and subject to adjustment — but do not purport to define an authoritative standard of care (see Diaz v New York Downtown Hosp., 99 NY2d at 544-545). Even so, and notwithstanding Aral's express identification of these guidelines as the standard of care, it is evident from his detailed testimony as to each patient that he utilized the guidelines as "one link in the chain" of his evaluation process (Hinlicky v Dreyfuss, 6 NY3d at 647 [internal quotation marks omitted]; see Leberman v Glick, 207 AD3d 1203, 1205 [4th Dept 2022]).
Aral is board certified in radiation oncology and licensed to practice medicine in New York, with over 30 years of experience. At the time of his testimony, he was the chief of the radiation oncology unit at a multi-specialty medical practice in Nassau County. Utilizing this experience, and after reviewing the medical records of each of the seven patients at issue, he provided a factual basis for his opinions as to both negligence and incompetence going far beyond a mere recitation of the guidelines (see Spensieri v Lasky, 94 NY2d at 239). Thus, we conclude that he provided competent expert testimony that the Hearing Committee could rely on in its determinations. Although petitioner's testimony contradicted Aral's and petitioner criticized Aral for his "very rigid opinion[s]" and "oversimplification of [the] practice of medicine," the Hearing Committee was free to credit Aral's opinions over those of petitioner. A more specific review of the pertinent testimony as to each patient follows.
The Hearing Committee determined that petitioner's treatment of patient A was both grossly negligent and grossly incompetent. Patient A, who had been diagnosed with metastatic breast cancer, was treated by petitioner from September 13, 2012 until late December 2012, when she passed away. She had previously completed a course of whole brain radiotherapy in January 2012 totaling 5,000 centigray (hereinafter cGy).[FN1] Aral explained that the objective of an initial patient evaluation is to determine whether there is any potential to eradicate the disease, in which [*4]case a curative regimen of higher radiation doses would be utilized. Where, as here, a patient has metastatic disease, and cannot be cured through radiation treatments, a "palliative" course of treatment would be warranted, involving limited radiation doses to relieve the patient's symptoms.
Considering patient A's treatment history, Aral opined that there was no likelihood that further radiation treatment would effect any cure, such that only palliative treatment was warranted to address her symptoms. Petitioner, however, administered a second course of radiation totaling 5,000 cGy over a five-week period. Significantly, Aral explained "that the whole brain can safely tolerate somewhere between 4,500 [cGy] to 5,000 [cGy]," such that further radiation increases the "likelihood or probability of permanent brain injury." Aral concluded that petitioner deviated from the standard of care in rendering an unwarranted curative course of radiation treatment, which presented a high likelihood of harming the patient without any corresponding medical benefit. While petitioner provided competing expert testimony, having credited Aral's testimony, the Hearing Committee's finding of gross negligence and gross incompetence with respect to Patient A is supported by substantial evidence.
With respect to patient B — a man in his 70s with metastatic prostate cancer — the Hearing Committee concluded that the "numerous courses of radiotherapy" administered to this patient were not indicated and were "particularly excessive during [his] final year of life," constituting a deviation from the accepted standard of care. It further found that petitioner's use of "high doses of radiation was not appropriate in the palliative setting" and that the medical records did not demonstrate that petitioner properly accounted for prior radiation, potentially exposing patient B to overlapping radiation in excess of normal tissue tolerances.
The record shows that petitioner administered several courses of high-dose radiotherapy to patient B over the course of approximately three years. The initial course of radiation, beginning in 2009, included 8,100 cGy of radiotherapy to patient B's prostate area and 4,500 cGy of radiotherapy to patient B's spine. Although Aral concluded that a course of palliative radiation might have been indicated for patient B's spine, he emphasized that the dose administered by petitioner was well in excess of the standard palliative dose, which caps out at 3,500 cGy. Tellingly, petitioner's own medical note from his initial appointment with patient B acknowledged that the aggressive approach he desired "was still considered noncurative and most of the time . . . would not be recommended." Nevertheless, when patient B requested aggressive treatment after being counseled on all of his options, petitioner obliged.
Patient B received additional radiotherapy to his lumbar spine between March and April 2011, after bone scans revealed metastatic disease in this [*5]location and after he refused chemotherapy. Petitioner then provided successive courses of additional radiotherapy to patient B in a relatively short period, including to both shoulders between June and July 2011, to his right mandible/jaw between August and September 2011, and to his right skull and pelvic region between December 2011 and January 2012. Patient B then underwent radiation to his right femur in February 2012 and finished his last dose of right pelvic radiation in March 2012, passing away shortly thereafter. Aral concluded that the high doses administered in many of these circumstances were not standard for palliative radiotherapy treatment and had the potential to cause serious soft tissue injuries. He further emphasized that the doses were "in no way restricted to potentially account for prior radiation," explaining that the records did not demonstrate that petitioner accounted for overlapping treatment sites to ensure that he was staying within the standard for normal tissue tolerances.
Kos agreed with Aral that petitioner exceeded the commonly prescribed palliative doses of radiotherapy for patient B, but did not consider this to be a deviation from the standard of care because patient B had oligometastatic prostate cancer and there were studies indicating that aggressive radiation therapy might be beneficial in these circumstances. Notably, Kos revealed that the treatment approach for oligometastatic disease was "somewhat controversial" in the field at that time. He also acknowledged a potential concern for overlapping treatment sites with respect to the "pelvis and prostate" areas, conceding that petitioner did not have "very good documentation on the treatment planning component" of patient B's care, which was his responsibility as a radiation oncologist. Although a different conclusion may have been viable, we conclude that the Hearing Committee's determination that petitioner acted with gross negligence and gross incompetence in treating patient B is supported by substantial evidence.
Patient C, a 64-year-old man, was referred to petitioner in April 2012 for possible radiotherapy to treat his prostate cancer. Upon reviewing patient C's records, petitioner felt that patient C had "aggressive" prostate cancer and a right axillary iliac lymph node may have been the site of potential metastases. Petitioner recommended treating the prostate region and the pelvic lymph node with conformal radiation, along with hormonal therapy. Notably, although Aral opined otherwise, the Hearing Committee determined that petitioner's "delivery of radiation concurrently with hormone therapy did not depart significantly from the accepted standard of care." The Hearing Committee did determine that petitioner's failure to immediately refer patient C to a medical oncologist after noting elevated levels of Prostate Specific Antigen was a significant deviation from the standard of care. Instead, petitioner completed two additional courses of radiotherapy [*6]after the disease had spread, further delaying other treatment options to patient C's detriment. Aral concluded that this was a deviation from the standard of care which, at that point, required "additional systemic" treatment including other hormonal blockades or chemotherapy. Aral also noted that there was no indication in the record that petitioner considered "the prior radiation treatment" in delivering the second course of radiation to determine the potential for dose overlap to the small bowel or intestine. Compounding the problem, the Hearing Committee determined that the record was unclear as to which anatomical sites were irradiated in patient C and petitioner's testimony was contrary to his own medical records. To illustrate, petitioner testified that he did not irradiate the iliac lymph node while Kos testified this lymph node had received 8,100 cGy. Based on these deviations, the Hearing Committee's findings of gross negligence and gross incompetence are supported by substantial evidence.
Patient D was a 46-year-old man who had been diagnosed with chronic lymphocytic lymphoma in 2007 and presented to petitioner for treatment in 2012. We first take note that the Hearing Committee did not sustain the charges of gross negligence or gross incompetence with respect to petitioner's treatment of this patient, but found that he was negligent and incompetent for treating patient D with radiation without having a clear understanding of the patient's prior radiation history. Pertinent in that regard, petitioner's office had received patient D's medical records from California but he was unable to tell how much radiation had been applied to certain areas, including the parotid and salivary glands, which he treated with radiation. The Hearing Committee's finding is supported by substantial evidence and relevant to the additional charges that petitioner was negligent and incompetent on more than one occasion (see Education Law § 6530 [3], [5]).
Patient E was a 43-year-old woman who was referred to petitioner for a second opinion after being diagnosed at Roswell Park Cancer Institute in the City of Buffalo, Erie County, with primary rectal carcinoma and metastasis to her liver, with a recommendation to begin chemotherapy. Aral agreed that chemotherapy was warranted given that the disease had metastasized. He opined that palliative radiation might be appropriate for the rectal cancer but not the liver. Aral further testified that the 4,750 cGy radiation petitioner applied to the liver was excessive. The Hearing Committee found that petitioner's treatment with two localized courses of radiotherapy for the liver, in lieu of chemotherapy, was a significant departure from the standard of care. In so finding, the Hearing Committee expressly found Aral's testimony more credible than the contrary testimony of Kos. Deferring to this credibility determination, we conclude that the finding of gross negligence and gross incompetence with respect to petitioner's [*7]treatment of patient E is supported by substantial evidence.
We reach the same conclusion with respect to the Hearing Committee's findings of gross negligence and gross incompetence in petitioner's treatment of patient F, a 62-year-old man diagnosed with stage 4 small cell carcinoma of the right lung. Aral testified that stage 4, by definition, indicates that the patient will "never be cured of the disease, so the role for radiation is palliative." Aral agreed with the patient's medical oncologist that chemotherapy was the appropriate course of treatment because it addresses the disease systemically. And yet, petitioner pursued a protracted curative, rather than a palliative, course of radiation treatment, which Aral deemed a deviation from the standard of care.
In 2009, patient G, a 25-year-old male, received a diagnosis of sacral chordoma and underwent surgical procedures at Roswell Park Cancer Institute, where he also received chemotherapy and radiation therapy. In 2011, patient G was referred to petitioner due to the recurrent sacral chordoma. At that time, Roswell Park recommended that patient G engage in a clinical trial study as "all standard options" had been explored. In May 2011, petitioner initiated a course of conformal radiation therapy. In November 2011, when a follow-up examination revealed tumor recurrence, petitioner applied another course of radiation while indicating to patient G that he lacked medical alternatives.
Upon reviewing patient G's medical records, Aral testified that patient G's tumor was in his lower back and sacrum. Despite presurgical radiation, his tumor had progressed and he developed pulmonary metastasis while undergoing chemotherapy. Aral explained that a chordoma is "one of the most radiation resistant tumors" as evidenced by patient G's poor response to radiotherapy at Roswell Park. Aral opined that petitioner deviated from the standard of care by not properly accounting for patient G's prior radiation treatment and then delivering excessive radiation over several rounds of radiation therapy. Patient G passed away less than a month after his last radiation treatment. The Hearing Committee determined that petitioner's use of "excessive and multiple doses of radiation" constituted a significant departure from the standard of care, validating the charges of gross negligence and gross incompetence. In our view, that determination is supported by substantial evidence in the record.
In sum, the Hearing Committee's determinations as to petitioner's treatment of each of the seven patients at issue are supported by substantial evidence. Petitioner does not challenge the penalty imposed; the determination of the Hearing Committee should be confirmed and the petition dismissed.
Clark, J.P., and McShan, J., concur.
Powers, J. (dissenting).
Respectfully, we dissent. To begin, we agree with the majority that matters of credibility are within the province of the Hearing Committee (see Matter of Roberts v State Bd. [*8]for Professional Med. Conduct, 215 AD3d 1093, 1094 [3d Dept 2023], lv denied 40 NY3d 907 [2023]) and further agree that substantial evidence is a minimal standard (see Matter of Vera-Llivicura v State of New York, 211 AD3d 1447, 1449 [3d Dept 2022]). It is not, however, a meaningless one. There is, in our opinion, a distinction to be drawn between those cases where the Committee's decision rests upon evidence of departure from the standard of care established within the medical community and those, such as here, where the determination is premised upon professional practice materials intended to be used only as educational tools and which, by express disclaimer, are designed to be merely advisory in nature. While the guidelines are informative, the notion that they prove the industry standard was rejected in Diaz v New York Downtown Hosp. (99 NY2d 542, 544 [2002]).
Here, the findings of the Committee were premised entirely on the erroneous understanding of respondent's expert, Isamettin Aral, that professional societies establish the accepted standard of care. The record reflects that, on cross-examination, petitioner's counsel asked Aral the question, "what do you mean when you say standard of care?" In response, Aral testified, "[w]e have accepted guidelines that are published by multiple societies, they include our board, [the] American College of Radiology or [the] American Board of Radiology, [and] national comprehensive cancer networks and these are fairly descriptive, prescriptive guidelines for what a physician should do in the management of cases in very specific areas. When you deviate from those, it is considered to fall short of a standard."
Although we acknowledge that petitioner pursued what appears to have been aggressive care with the goal of prolonging the lives of patients A-G and was in accordance with their wishes, the record lacks any reference to pervasive standards outlining physician obligations relative to the extraordinary circumstances of terminally ill patients with advanced, late-stage disease. As Aral's testimony is unsupported by an evidentiary foundation and the Bureau of Professional Medical Conduct offered no other proof, we would find the Committee's determination to be fatally flawed, fundamentally unfair and affected by an error of law.
Accordingly, the determination of the Hearing Committee should be annulled and the matter remitted for further proceedings.
Reynolds Fitzgerald, J., concurs.
ADJUDGED that the determination is confirmed, without costs, and petition dismissed.

Footnotes

Footnote 1: A cGy is a unit of measure for radiation treatment.